**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

| | | |
|---|---|---|
| GC SERVICES LIMITED PARTNERSHIP | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 19-372 C |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff GC Services Limited Partnership ("GC Services"), by and through its undersigned counsel, files this Complaint seeking injunctive and declaratory relief against Defendant, acting by and through the United States Department of Education ("ED" or "the Agency").

## NATURE OF THE ACTION

1.     This is a preaward bid protest action brought by Plaintiff GC Services challenging ED's arbitrary, capricious, and unlawful cancellation of Request for Proposals ED-FSA-16-R-0009 ("the PCA solicitation") on March 6, 2019.

2.     GC Services also challenges the terms of ED's Next Generation Processing and Servicing Environment procurement ("Next Gen procurement"), which includes three solicitations, the Next Gen Optimal Processing Solution Platform RFP (No. 910031119R0007), the Next Gen Enhanced Processing Solution RFP (No. 91003119R0005) and the Next Gen Business Process Operations RFP (No. 91003119R0008) (collectively, the "Next Gen RFPs"). Specifically, GC Services challenges ED's improper decision to (1) consolidate separate requirements for an IT system, loan servicing, and default collection services under the Next Gen

RFPs, thereby improperly restricting competition in violation of the Competition in Contracting Act ("CICA") and (2) make a single award for the Enhanced Processing Solution, which violates procurement statutes and regulations.

3.      ED is responsible for performing collection and administrative resolution services on debts resulting from non-payment of student loans.  Since 1981, ED's Federal Student Aid division has contracted for the services of Private Collection Agencies ("PCAs") to support collection and administrative resolution services on debts maintained by ED.  GC Services has over 30 years of successful performance as a default collection services contractor for ED.

4.      Since 2015, ED has attempted to procure default collection services under the PCA solicitation and has defended its evaluations in connection with that solicitation in multiple rounds of bid protest litigation before the U.S. Government Accountability Office ("GAO") and this Court.  Following years of defending its award decisions in connection with the PCA solicitation, the Agency abruptly cancelled the solicitation on May 7, 2018, stating that it had a "new vision" for an enhanced servicer(s) to service borrower accounts.  Attach. A (CO Decision Memorandum, Def.'s Reply & Ex. 1, *FMS Investment Corp., et al. v. United States*, No. 18-204C (Fed. Cl. May 23, 2018) (ECF 244)).  However, the Court of Federal Claims concluded that ED did not have, or did not sufficiently document, a rational basis for its decision to cancel the PCA solicitation.  *FMS Investment Corp., et al. v. United States*, 139 Fed. Cl. 221, 223 (2018).  Indeed, the Court identified several critical gaps in the Administrative Record ("AR") upon which the Agency based its cancellation decision, calling it "scant" and "slipshod." *Id.* at 225.  Accordingly, the Court issued a permanent injunction preventing ED from cancelling the PCA solicitation.  *Id.* at 226.

5.     Instead of proceeding to evaluate proposals submitted in accordance with the PCA solicitation to address its burgeoning student loan debt crisis, ED took no cognizable action in connection with the PCA solicitation for six months.  Then, mere days after other PCAs filed complaints with the Court of Federal Claims challenging the de facto cancellation of the PCA solicitation, and one day after GC Services filed its pre-filing notice with the Court indicating its intent to protest, ED formally cancelled the PCA solicitation on March 6, 2019.  *See* Attach. B (Amend. 10, Solicitation No. ED-FSA-16-R-0009); *see also FMS Investment Corp. v. United States*, No. 19-308C (Fed. Cl. Feb. 27, 2019); *Continental Serv. Grp., Inc. v. United States*, No. 19-331C (Fed. Cl. Mar. 4, 2019).

6.     The Agency's decision to cancel the PCA solicitation is arbitrary and capricious.  ED's notice does not provide any rational basis to cancel the PCA solicitation.  ED is apparently relying on the implementation of its new Next Gen procurement to process and service the rising tide of defaulted student loans, but there is still no explanation for ED's change in policy and no analysis, data, or assurances that the Next Gen program will have the capacity to effectively collect on defaulted student loans or reduce the need for default collection services.

7.     Moreover, there has been no change in requirements that justifies cancelling the PCA solicitation.  If anything, the need for PCAs is more urgent than ever.  The defaulted student loan portfolio continues to grow by leaps and bounds.  ED data shows that the dollar value of new student loan debt entering default in FY 2015 was $18.36 billion and in FY 2018, it had jumped to $24.43 billion.  Attach. C (Department of Education, Federal Student Aid, Direct Loans Entering Default).  Furthermore, the contracts for the newest Award Term Extension ("ATE") contractors will expire in April 2019, leaving ED with fewer PCAs to collect an ever increasing defaulted student loan workload and no large businesses.  The Next Gen

procurement does not include any estimate of future defaulted loan volumes or vendor processing capacity that indicates that the tide of defaulted student loan debt will be stemmed by the implementation of the new program. Therefore, ED's decision to cancel the PCA solicitation does not have a rational basis.

8.     In addition to cancelling the PCA Solicitation, the Agency has unduly restricted GC Services' and other PCAs' ability to compete for default collection services for ED under the Next Gen RFPs. The Agency has improperly consolidated the creation of an IT system and architecture with servicing activities, including the provision of default collection services, in the Next Gen RFPs. Consequently, GC Services and other PCAs are shut out from performing these services unless they can team with other offerors to provide the full complement of services required by ED. ED has thereby improperly restricted GC Services and other PCAs that exclusively perform default collection services and have successfully partnered with the Agency for decades from working with ED to meet its significant and increasing student loan debt collection needs. The Agency's unjustified attempts to consolidate disparate requirements and exclude the PCAs arbitrarily restricts competition.

9.     Moreover, ED's improper decision to make a single award for the Enhanced Processing Solution implements a one-servicer approach, potentially for up to four years, that violates the Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019 (Pub. L. No. 115-245) (Sep. 28, 2018), which made funding for FSA's Next Gen procurement contingent on the participation of multiple student loan servicers.

10.     GC Services will suffer irreparable harm as a result of ED's unreasonable decision to cancel the PCA solicitation and shut GC Services out of performing default collection

services for an agency it has worked successfully with for decades. Additionally, GC Services will suffer irreparable harm as a result of ED's unreasonable decision to obtain default collection services under the Next Gen procurement and denial of a meaningful opportunity to provide these services directly to the Government. ED's arbitrary and capricious action will also damage GC Services' competitive position. Finally, ED's arbitrary and capricious conduct will harm the public interest by failing to assign defaulted student loan accounts to experienced PCAs capable of providing default collection services and damage the integrity of the procurement process.

11. Accordingly, GC Services requests that the Court declare that ED's cancellation of the PCA solicitation is arbitrary, capricious, and unlawful and that ED's decision to procure default collection services under the Next Gen RFPs is arbitrary, capricious, and in violation of CICA and other applicable procurement laws and regulations. GC Services further requests that this Court enjoin the cancellation of the PCA solicitation, require ED to restore the posture of the process before the illegal cancellations, and direct ED to proceed with the award process under the PCA solicitation. In addition, GC Services seeks an order requiring ED to cancel the Next Gen procurement or unbundle default collection services and separately procure these services to allow GC Services an opportunity to provide these services directly to ED.

## THE PARTIES

12. Plaintiff GC Services, located in Houston, Texas, is an industry-leading default collection services provider with a long history of providing collection services to ED.

13. Defendant is the United States of America, acting by and through the U.S. Department of Education ("ED" or "the Agency").

## JURISDICTION

14. The United States Court of Federal Claims has jurisdiction over this bid protest pursuant to the Tucker Act, 28 U.S.C. § 1491(b).

15.     GC Services is an interested party to protest the cancellation of the PCA solicitation because its direct economic interest has been prejudicially affected by the Agency's decision to cancel the PCA solicitation, which improperly deprived GC Services of an opportunity to compete for debt collection services under that solicitation.

16.     Furthermore, as a prospective offeror whose direct economic interest is affected by the improper consolidation of distinct services under the Next Gen procurement, GC Services is an interested party to protest the terms of the Next Gen RFPs.  ED's decision to consolidate distinct and separate requirements for building an IT system, along with loan servicing and debt collection services, removes GC Services' opportunity to compete for default collection services work because GC Services must team with other offerors to provide the full array of services contemplated by the Next Gen procurement and can no longer provide default collection services directly to the Government.  Finally, GC Services' direct economic interest is affected by the Agency's violation of federal law in connection with its adoption of a single-vendor approach for the Enhanced Processing Solution of the Next Gen procurement.

17.     Therefore, GC Services has a definite economic stake in the PCA solicitation and Next Gen RFPs being carried out in accordance with applicable laws and regulations.  ED's actions prevent GC Services from competing for default collection services and receiving awards under the resultant contracts for up to ten years.

18.     The remedies sought by GC Services are authorized pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

## STATEMENT OF FACTS

### A.     Contracts with Private Collection Agencies for Default Collection Services

19.     ED manages the federal student aid portfolio based upon borrowers' delinquency status.  Accounts that are delinquent less than 360 days are serviced by loan servicing companies

while loans that have been delinquent for more than 360 days and are in default are placed in the Debt Collection Management System ("DCMS").  Loans in DCMS are periodically assigned to Private Collection Agencies ("PCAs") that support collection and administrative resolution services on defaulted student loans maintained by ED.  *See* Attach. D, Decl. of William Leith ¶ 6, *Continental Serv. Grp., Inc. v. United States*, Nos. 17-449C, et al. (Fed. Cl. Aug. 4, 2017) (ECF 183-2) ("Leith Decl.").

20.     Loan servicers provide counseling to borrowers while they are in school, in the post-graduation grace period, or after entering repayment.  Servicers are assigned loans after funds are disbursed to students, contact borrowers once they are in the grace period prior to repayment of a loan to identify a repayment plan, and set up payment methods.  Once loans are in repayment, loan servicers provide borrowers with billing statements, assist in processing payments, and process changes to repayment plans and forbearance and deferments.  *Id.* ¶ 5.

21.     By contrast, PCAs perform services on defaulted loans that are 360 days past due. They engage in skiptracing efforts to locate borrowers that have defaulted on student loans, communicate and negotiate with borrowers to resolve student loan debts through payment, rehabilitation, and consolidation.  PCAs also process involuntary payment actions such as Administrative Wage Garnishment ("AWG"), where individuals that fail to make payments according to their repayment plans have their wages garnished.  *Id.* ¶ 6.

22.     GC Services first began performing default collection services for ED in 1981.  In 2009, ED awarded GC Services a five-year contract to provide debt collection, loan rehabilitation, and administrative resolution services under Task Order No. ED-FSA-09-O-0012 pursuant to GSA Federal Supply Schedule Contract No. GS-23F-0279K.  During the 2009 task

order, GC Services received over 1.2 million borrower transfers totaling nearly $16 billion. GC Services was a top performer on the incumbent 2009 task order with excellent past performance.

23. On April 22, 2015, ED awarded GC Services a two-year ATE contract, which extended the services provided under the 2009 task order based on the superior quality of its contract performance. GC Services was one of only five contractors that were granted two-year ATE contracts based upon the quality of performance during evaluation periods. GC Services' ATE contract is currently in the in-repayment period, which will expire in April 2019.

**B.** **The PCA Solicitation (RFP No. ED-FSA-16-R-0009)**

24. ED issued the PCA solicitation on December 11, 2015. The acquisition was issued as a full and open competition. The Government anticipated awarding multiple Indefinite Delivery/Indefinite Quantity contracts under NAICS Code 561440 with a base period of five years and a single five-year optional ordering period.

25. On December 9, 2016, ED awarded contracts to seven of the 48 offerors that submitted proposals in response to the PCA solicitation, including GC Services.

**C.** **Bid Protests in Connection with the 2016 Contract Awards and Corrective Action**

26. The 2016 contract awards were the subject of multiple bid protests at GAO and the Court of Federal Claims. *See, e.g.*, *General Rev. Corp.*, B-414220.2, et al., Mar. 27, 2017, 2017 CPD ¶ 106; *Continental Serv. Grp., Inc. v. United States*, No. 17-449C (Fed. Cl.).

27. On May 19, 2017, Defendant filed a Notice of Corrective Action in the Court of Federal Claims protests stating that ED intended to amend the PCA solicitation and allow offerors to submit revised proposals. Def.'s Notice of Corrective Action, *Continental Serv. Grp., Inc. v. United States*, No. 17-449C (Fed. Cl. May 19, 2017) (ECF 122). ED subsequently

amended the PCA solicitation, and GC Services timely submitted its revised proposal in response to the PCA solicitation on June 20, 2017.

28. In the course of the bid protest litigation at the Court of Federal Claims, ED underscored that loan servicing and processing is distinct from collections activities performed by PCAs. The Chief Business Operations Officer for Federal Student Aid stated that "the work to be performed under Solicitation ED-FSA-16-R-0009 is different from loan servicing, involving an entirely separate procurement effort." Attach. D, Leith Decl. ¶ 4. Mr. Leith also stated: "The work of the loan servicers is separate and distinct from the debt collection work that the PCAs perform under their respective contracts" and continued "these two functions (loan servicing versus default collection), are substantively different and take place at different stages in the life of a loan. FSA acquires these two types of services using distinct and separate solicitations and contracts." *Id.* ¶¶ 6-7. With regard to the Agency's development of the Next Gen procurement, Mr. Leith stated that it "in no way impacts any corrective action currently underway on the PCA solicitation at issue in these cases, as such activities relate solely to loan servicing and not collection activities for defaulted student loans." *Id.* ¶ 9.

29. After failing to meet its own schedule for reevaluating proposals and making new award decisions, the Agency finally completed its evaluation of offerors' proposals and award determinations after this Court ordered the Source Selection Authority to complete the corrective action by January 11, 2018. *See* Order, *Continental Serv. Grp., Inc.*, *et al. v. United States*, No. 17-449C (Fed. Cl. Dec. 12, 2017) (ECF 215). On January 11, 2018, GC Services received a notice of unsuccessful offeror, advising that GC Services was not selected for award and that Performant Recovery, Inc. ("Performant") and Windham Professionals, Inc. ("Windham") had received contract awards.

### D. February 2018 Protests at the Court of Federal Claims

30.     On February 9, 2018, GC Services filed a protest with the Court of Federal Claims challenging ED's improper evaluation of its proposal and the flawed award determinations. *See* Compl., *GC Services Limited P'ship v. United States*, No. 18-208C (Fed. Cl. Feb. 9, 2018) (ECF 1). GC Services also requested preliminary injunctive relief from the Court in connection with ED's improper decision to recall accounts from GC Services' 2015 ATE contract. *See* Mot. for TRO & Mot. for Prelim. Inj., *GC Services Limited P'ship v. United States*, No. 18-208C (Fed. Cl. Feb. 12, 2018) (ECF 10).

31.     Multiple other unsuccessful offerors filed bid protests challenging their evaluations and the awards made to Performant and Windham in connection with the RFP, and the Court consolidated the protests. *See* Order, *FMS Investment Corp., et al. v. United States*, No. 18-204C (Fed. Cl. Feb. 13, 2018) (ECF 16). GC Services filed a motion for temporary restraining order and preliminary injunction along with FMS Investment Corp., Account Control Technology, Inc., and Continental Service Group, Inc., and on March 6, 2018, the Court issued a redacted opinion and order entering a preliminary injunction. *FMS Investment Corp., et al. v. United States*, 136 Fed. Cl. 439 (2018). In its opinion, the Court stated that "it is convinced that Plaintiffs are likely to succeed on the merits of their bid protests," and that it had "serious questions" over ED's evaluation of proposals based on "[t]he evidence currently before the Court [which] points to inconsistencies, omissions, unequal treatment of offerors, and cherry-picked data that the Court finds to be rather problematic." *Id.* at 442-43. Accordingly, the Court concluded that GC Services and the 2015 ATE-holders had demonstrated a likelihood of success on the merits of their bid protests and that injunctive relief was appropriate. *Id.* at 443.

32.     On March 19, 2018, ED filed a Notice with the Court indicating that "it appears likely that a course of action other than continued litigation of the pending protests will be pursued." Def.'s Notice, *FMS Investment Corp., et al. v. United States*, Nos. 18-204C, et al. (Fed. Cl. Mar. 19, 2018) (ECF 149).

33.     On May 3, 2018, DOJ filed a Notice announcing that the solicitation would be cancelled and the awards to Performant and Windham terminated for convenience on or after May 7, 2018. The Notice stated:

> The solicitation will be cancelled due to a substantial change in the requirements to perform collection and administrative resolution activities on defaulted Federal student loan debts. In the future, ED plans to significantly enhance its engagement at the 90-day delinquency mark in an effort to help borrowers more effectively manage their Federal student loan debt. ED expects these enhanced outreach efforts to reduce the volume of borrowers that default, improve customer service to delinquent borrowers, and lower overall delinquency levels. The current private collection agencies (PCA) under contract with ED have sufficient capacity to absorb the number of accounts expected to need debt collection services while the process for transitioning to the new approach is developed and implemented. Therefore, additional PCA contract work is not currently needed.

Def.'s Notice, *FMS Investment Corp., et al. v. United States*, No. 18-204C (Fed. Cl. May 3, 2018) (ECF 188) at 1.

34.     On May 7, 2018, ED cancelled the PCA solicitation and announced that the contracts awarded to Performant and Windham had been terminated for the convenience of the Government. *See* U.S. Dep't of Education, Office of Federal Student Aid, Modification/ Amendment, Solicitation No. ED-FSA-16-R-0009 (May 7, 2018), *available at* https://www.fbo.gov/index?tab=documents&tabmode=form&subtab=core&tabid=c5fa9f49ec8bc f614603c1cc19ab977f (last visited Mar. 10, 2019). Defendant also filed a Motion to Dismiss on May 7, 2018, requesting that this Court dismiss the consolidated bid protests as moot in light of

ED's decision to cancel the solicitation. Def.'s Mot. to Dismiss, *FMS Investment Corp., et al. v. United States*, No. 18-204C (Fed. Cl. May 7, 2018) (ECF 189).

35.     On May 23, 2018, Defendant filed a Reply in support of its Motion to Dismiss, attaching a May 3, 2018 Contracting Officer's Decision Memorandum ("CO Decision Memorandum"). *See* Attach. A (CO Decision Memorandum). The CO Decision Memorandum stated that FSA's needs for servicing loans in delinquency and default would change significantly in the near future. *Id.* at 1. The Memorandum further stated that ED intended to create a new portfolio of loans starting at 90 days or more delinquent versus 360 days or more delinquent that will be serviced by "an enhanced servicer(s)." *Id.* at 1-2. The CO Decision Memorandum also stated:

> As a result of this new approach, FSA will need a contractor(s) that will focus solely on the resolution of delinquencies and collection activities for the new portfolio of work that will be comprised of accounts beginning at 90 or more days delinquency. The contractor(s) will provide all aspects of collection and default resolutions related to servicing borrower accounts in repayment including entitlements such as deferments, forbearances, repayment plans discharge/forgiveness, etc. and the same contractor(s) will be able to handle post default collections such as AWG and TOP. All proposed changes to current collection practices will be reviewed to ensure legal compliance with the Higher Education Act, Department and Treasury regulations, and other applicable regulations before they are implemented.

> In addition, based on input from FSA Business Operations, I have determined that the current volume of defaulted borrowers portfolio can be handled successfully by the eleven (11) small business contractors currently providing Debt Collection Services. The eleven (11) small businesses are presently under their base period of performance which ends on September 30, 2019. Thereafter, FSA has the option of extending those contracts for an additional 5 years through September 30, 2024. Presently, the eleven small businesses are capable of handling approximately 750,000 new accounts per month. Specifically, FSA projects that, at most (even without considering the transition to the enhanced servicer(s), FSA would need to place approximately 120,000 accounts on a monthly basis. In short, FSA has more than sufficient capacity under the existing contracts, even if the plan changes or is delayed for a significant period of time.

*Id.* at 2.

36.     The CO Decision Memorandum did not state how or when the Agency intended to procure enhanced servicing for its new portfolio of loans.  *See id.* at 1-2.

37.     On May 25, 2018, the Court issued an Opinion and Order dismissing the cases. Order Dismissing Cases, *FMS Investment Corp., et al. v. United States*, No. 18-204C (Fed. Cl. May 25, 2018) (ECF 247).

**E.     Protests Challenging ED's Cancellation of the PCA Solicitation**

38.     On June 19, 2018, GC Services filed a protest at the Court of Federal Claims challenging the Agency's arbitrary, capricious, and unlawful cancellation of the PCA solicitation on May 7, 2018.  Multiple other offerors also filed protests challenging ED's cancellation decision, which were consolidated by the Court.

39.     GC Services and other plaintiffs alleged that the Agency's decision to cancel the PCA solicitation was based on a mere plan to prevent borrowers from defaulting at an indeterminate time in the future.  The Cancellation Decision provided no assurances that the strategy would be implemented, when it would be implemented, or whether it would be effective in reducing the need for default collection services.  Accordingly, the Agency's argument that the need for default collection services would diminish in the near future was purely speculative.

40.     During the litigation, Defendant consistently refused to identify any timeline for the implementation of its enhanced servicing approach.  Indeed, at a hearing on June 19, 2018, when asked what the target date for the issuance of a solicitation was, Defendant stated: "[T]here's no target date right now."  *See* Transcript, *FMS Investment Corp., et al. v. United States*, Nos. 18-862C, et al. (Fed. Cl. July 19, 2018) ("Tr.") 39: 14-15.

41.     Defendant could not even say whether enhanced servicing would be part of the Next Gen procurement or whether it would be part of a new solicitation. Defendant and the Court engaged in the following colloquy at the July 19th hearing:

> THE COURT: Can you tell me what the agency's game plan is going forward?
>
> MR. PEHLKE: Well, right now, part of their game plan has been dealing with a lot of what's been happening here. In the broader sense they continue to work – move forward on developing the enhanced servicer program, and there also – there's the next-gen procurement which is moving out, which is phased, a phase one and phase two. My understanding is the initial phase deals more with that -- with the earlier part of the life cycle of loans, when they first come in and setting up the systems and processes to deal with that, and they're looking at now how they move forward and how the procurement will move forward. Will it be a part of next-gen? Will it be a separate procurement?

Tr. 37: 10-24.  Later, Defendant admitted that enhanced servicing "could be a phase two or different solicitation to bring that together." Tr. 39: 16-17.

42.     Indeed, Defendant conceded at an August 30th hearing at the Court of Federal Claims that enhanced servicing was not incorporated into the Next Gen Phase I RFP, and that the decision to incorporate enhanced servicing into the Next Gen procurement would be made after the evaluation of Phase I proposals.  During the hearing, Defendant stated with regard to Next Gen:

> So the NextGen went onto the street on February 20th. The proposals were due in April. They are currently being evaluated for phase 1, and phase 1 is about implementing and developing this seamless system online. Because currently, what – and this you see in some of the enhanced servicer description and some of the problems that we discuss in our briefs is designed to deal with, right now there's every PCA, every debt collector, they have their own websites, there's a lot of different mechanisms for borrowers to deal with whoever it is handling their account, and the goal is to get one platform that services the life of a loan.
>
> So that's phase 1 is about developing that technology. When -- so my understanding of the timeline right now is the one decision that needs to be made for ED is whether or not they are going to do the enhanced servicing strategy via phase 2 of the NextGen procurement, or if they're going to separately procure it.

Separate services. And that decision won't be made until they finish the phase 1 evaluation, which is ongoing.

And they anticipate that that should be done in the early fall. And once that's done, then they will make a decision about are we going with phase 2 NextGen, or are we doing its own solicitation? They can't make that choice until they get through the phase 1 evaluation. That's my understanding of it.

*See* Tr., *FMS Investment Corp., et al. v. United States*, Nos. 18-862C, et al. (Fed. Cl. Aug. 30, 2018) 58: 1-25-59: 1-3 (emphasis added).

43.    On September 14, 2018, the Court issued a public opinion enjoining ED from proceeding with the cancellation of the RFP based on the AR and granting GC Services' and the consolidated plaintiffs' motions for judgment on the administrative record. *FMS Investment Corp., et al. v. United States*, 139 Fed. Cl. 221 (2018). The Court concluded that ED's decision to cancel the solicitation based on the AR was irrational, arbitrary, and capricious. Its opinion stated that "the AR is missing critical information about the enhanced servicer program," including any plan or timeline for implementation, a request for proposals, or a source of funding. *Id.* at 225. The AR also lacked estimates of current and future defaulted loan volumes and loan processing capacity. *Id.* The Court noted that the cancellation notice assumed that enhanced servicers would begin processing loans in the near future, but shed no light on exactly when the enhanced servicers would begin processing loans or what the enhanced servicers' processing capacity would be. *Id.* Accordingly, the Court granted plaintiffs' motions for a permanent injunction. *Id.* at 226.

**F.    The Next Generation Processing and Servicing Environment Procurement**

44.    While the Agency was completing its reevaluation of proposals in connection with the PCA solicitation, which resulted in two contract awards to Performant and Windham in January 2018, it was simultaneously developing a new plan to transform its financial aid delivery

-15-

architecture. On August 1, 2017, U.S. Secretary of Education Betsy DeVos announced her intent to transform the customer service experience for student loan borrowers by implementing a single data processing platform to house all student loan information. *See* Attach. E (Dep't of Education, Secretary DeVos Announces Intent to Enhance FSA's Next Generation Processing and Servicing Environment (Aug. 1, 2017)).

45.     Secretary DeVos asserted that the new system would "improve customer service"; generate "a customer support system that is as capable as any in the private sector"; create "a significantly better experience for students"; and result in "meaningful benefits for the American taxpayer." *See id.*

46.     The press release also indicated that "[t]he anticipated FSA Next Generation Processing and Servicing Environment will provide for a single data processing platform to house all student loan information while at the same time allowing for customer account servicing to be performed either by a single contract servicer or by multiple contract servicers." *Id.*

47.     On November 29, 2017, ED announced that Next Gen would modernize the technology and operational components that support federal student aid programs from application through repayment. Specifically, in spring 2018, ED stated it would launch a mobile platform to allow students to complete and submit the Free Application for Federal Student Aid ("FAFSA") from a mobile phone. ED also planned to integrate FAFSA into its student aid website. Eventually, FSA stated it would consolidate all of its customer websites into a single user platform to provide borrowers with a consistent experience from application through repayment. The Agency anticipated issuing one or more solicitations in the first quarter of 2018 focused on account processing and servicing. *See* Attach. F (Dep't of Education, U.S. Dep't of

Education Announces Vision to Transform Federal Student Aid, Improve Customer Service (Nov. 29, 2017)).

48.     On February 20, 2018, ED issued Phase I of the Next Gen solicitation, which was originally issued as a two-phase procurement conducted in accordance with 20 U.S.C. § 1018a(d) and ED Acquisition Regulation ("EDAR") 3415.302-70(b).  Only sources selected in Phase I were eligible to participate in Phase II.  *Id.* at 22-23.

49.     Responses to the Next Gen Phase I RFP were due on April 18, 2018.  *Id.* at 27. Based on the information in the Next Gen Phase I RFP, GC Services timely submitted its proposal in response to Component E (Solution 3.0 business process operations) and Component F (Solution 2.0 business process operations).

### G.     GC Services' Next Gen Phase I Bid Protest

50.     Absent any indication from ED regarding when and how it intended to procure enhanced servicing, on June 4, 2018, GC Services filed a bid protest at GAO in connection with the Next Gen Phase I RFP, alleging that the Phase I RFP did not incorporate the Agency's strategy for enhanced loan servicing detailed in the Contracting Officer's Decision Memorandum.  *See GC Servs. Limited P'ship*, B-416443, 416443.2, Sept. 5, 2018, 2018 CPD ¶ 313.  GC Services argued that the Next Gen RFP was materially flawed because it did not reflect the Agency's actual requirements and contended that the strategy announced in the CO Decision Memorandum and the focus on enhanced servicing constituted a material change to the Next Gen Phase I requirement.  Accordingly, in light of the material changes to the Next Gen Phase I RFP, GC Services argued that these material changes to the scope of the RFP's objectives and constraints should have resulted in an amendment to the RFP and the opportunity for new or revised RFP responses based on ED's actual needs.

51.     GAO denied GC Services' protest, stating that the procurement was conducted pursuant to FSA's two-phase procurement authority and that, as such, the Agency was required to provide only a general description in Phase I of the scope or purpose of the procurement. GAO further stated that the Agency's Phase I description was sufficient to provide prospective offerors an understanding of the general purpose of the services being procured.  *Id.* at 7.

52.     In footnote seven of its decision, however, GAO stated that it "question[ed] the agency's position" that the RFP's general references to concepts such as innovation and flexibility reasonably put offerors on notice of the Agency's anticipated enhanced servicing requirements.  *Id.* at 9 n.7.

**H.     Next Gen Phase II RFP**

53.     On September 24, 2018, ED announced the evaluation results of the Next Gen Phase I procurement.  ED also announced that it was combining Components E and F and releasing one solicitation in Phase II for business process operations services (RFP No. 91003118R0024).  Notably, the Business Process Operations Phase II Solicitation included requirements that appeared similar to default collections work.  Specifically, section C.3.3 of the Business Operations Phase II Solicitation stated that offerors' solutions shall provide "tailored customer assistance" and listed several activities, including skip tracing, which is traditionally performed by PCAs during collections efforts and requires locating a person's whereabouts. RFP No. 91003118R0024 § C.3.3 at 7.  In addition, section C.3.3 also requires solutions to provide processing capabilities, including "[r]ehabilitation, Administrative Wage Garnishment (AWG), Treasury Offset Program (TOP), and other related processing."  *Id.*  AWG and TOP capabilities are traditionally administered by PCAs, not loan servicers.  AWG is an involuntary payment program that authorizes ED to garnish the pay of an individual to collect a delinquent

nontax debt owed to the United States if the individual is not currently making required repayments in accordance with an agreement with the Agency. *See* 31 U.S.C. § 3720D. Under the TOP, ED may request that federal payments disbursed by agencies such as the Internal Revenue Service, including federal tax refunds, be offset by the amount of student loan debt owed.

54. On October 4, 2018, ED issued an amendment to the Business Process Operations Phase II RFP, responding to a question that asked "whether the scope of EF relates only to student loan repayment activities and services, or whether it relates to the broader scope of the student aid lifecycle beginning with the FAFSA application through the entire student aid lifecycle?" ED responded that "FSA anticipates that the Business Process Operations vendor(s) will support the entire student aid lifecycle."

55. On September 26, 2018, counsel for ConServe contacted FSA inquiring as to whether Components E and F of the Next Gen Phase II RFP included the procurement of default recovery services and/or enhanced servicer services. On October 5, 2018, FSA responded as follows:

> The Phase I Solicitation advised prospective offerors that NextGen contract(s) may encompass any and all activities associated with servicing of student aid, including servicing aid at every stage in the lifecycle, from application and disbursement of the aid, to payment and to servicing in delinquency or default status. As such, the Phase II Solicitation language for Business Process Operations (formerly referred to as Components E&F) advises eligible, prospective offerors that potential NextGen contract(s) may service the entire student aid lifecycle and life of the loan, ***including default servicing***.

*See* Attach. G (emphasis added).

56. On October 31, 2018, in connection with the PCA solicitation, FSA posted a notice to the Federal Business Opportunities website that stated: "FSA is considering a full range of options after the September 14, 2018 Court of Federal Claims decision. That broad-based

review takes time and necessitates a review of the procurement, the solicitation, and the program. FSA will announce its decision on how it intends to proceed with the procurement as soon as possible." *See* Attach. H at 5.

    **I.**    **Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019**

    57.    On September 28, 2018, the Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. No. 115-245, was signed into law. With regard to the Student Aid Administration, the statute provides funding for federal administrative expenses for provisions of the Higher Education Act, provided that specific conditions are met, including a provision requiring ED utilize more than one servicer for the Next Gen procurement. The Act states:

> For Federal administrative expenses to carry out part D of title I, and subparts 1, 3, 9, and 10 of part A, and parts B, C, D, and E of title IV of the HEA, and subpart 1 of part A of title VII of the Public Health Service Act, $1,678,943,000, to remain available through September 30, 2020: . . . *Provided further*, That in order to promote accountability and high-quality service to borrowers, the Secretary shall not award funding for any contract solicitation for a new Federal student loan servicing environment, including the solicitation for the FSA Next Generation Processing and Servicing Environment as amended by the Department of Education on February 20, 2018, ***unless such an environment provides for the participation of multiple student loan servicers that contract directly with the Department of Education to manage a unique portfolio of borrower accounts and the full life-cycle of loans from disbursement to pay-off with certain limited exceptions,*** and allocates student loan borrower accounts to eligible student loan servicers based on performance[.]

Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019 (Pub. L. No. 115-245) (Sep. 28, 2018) (emphasis added).

    58.    The statute specifically requires that the Next Gen procurement provide for multiple loan servicers to promote high-quality service to borrowers.

**J.      ED's Corrective Action in Connection with the Next Gen Procurement**

59.      In December 2018, GC Services filed a bid protest at the Court of Federal Claims challenging ED's decision to procure default collection services through Phase II of the Next Gen procurement, which was closed to GC Services and other offerors.  The protest was consolidated with other protests filed in connection with the Next Gen procurement.  *See Navient Solutions, LLC v. United States*, No. 18-1679C (Fed. Cl. Oct. 31, 2018).

60.      On December 4, 2018, the Court held a hearing on a motion for a preliminary injunction filed by plaintiff Higher Education Loan Authority of Missouri.  During the hearing, the Court stated:

> [W]hat appears to me is that the former default student loan contractors, who are among the Plaintiffs in this case, seem to have a fairly convincing argument that they have been excluded from the competition in this NextGen procurement now that default student loans have been added to the mix and, yet, they're not in a position to compete.
>      I think that's a pretty blatant violation of whatever competition requirements you say apply.  Whether they be the NextGen phase two procurement or the Competition in Contracting Act, I think either one of those would say there's most likely going to be a very clear violation of competition requirements, which would lead to corrective action down the road.
>      If that's true, it would seem to me it would be advantageous to the Department of Education to make that decision now.

Tr. of Oral Argument at 33: 4-20, *Navient Solutions, LLC, et al. v. United States*, Nos. 18-1679C, et al. (Fed. Cl. Dec. 4, 2018).

61.      On December 14, 2018, Defendant filed a motion to stay pending corrective action and stated that it was cancelling components of the Next Gen procurement and issuing a new solicitation(s) for the services sought in those components, using full and open competition procedures.  *See* Def.'s Mot. to Stay Pending Corrective Action*, Navient Solutions, LLC v. United States*, Nos. 18-1679C (Fed. Cl. Dec. 14, 2018).

62.     On January 15, 2019, ED released three new Next Gen solicitations:  the Next Gen Optimal Processing Solution Platform RFP (No. 910031119R0007), the Next Gen Business Process Operations RFP (No. 91003119R0008), and the Next Gen Enhanced Processing Solution RFP (No. 91003119R0005).  ED also cancelled the previous Next Gen solicitations for Components C, D, and E and F.

63.     On January 16, 2019, Defendant filed a Motion to Dismiss, requesting that the Court dismiss the consolidated bid protests as moot in light of the Agency's cancellation of components of the Next Gen procurement and issuance of new solicitations.  *See* Def.'s Mot. to Dis., *Navient Solutions, LLC, et al. v. United States*, Nos. 18-1679C (Fed. Cl. Jan. 16, 2019) (ECF 77).  On February 12, 2019, the Court dismissed the consolidated bid protests. Order, *Navient Solutions, LLC, et al. v. United States*, Nos. 18-1679C (Fed. Cl. Feb. 12, 2019) (ECF 81).

**K.     The Three Next Gen RFPs**

64.     The new Next Gen RFPs issued by ED on January 15, 2019 consolidate separate, distinct FSA functions and processes, including default recovery services.

65.     The Next Gen Optimal Processing RFP (No. 910031119R0007) calls for the creation of a new IT system architecture to support the entire lifecycle of student financing, from functions for application for financing, to origination and disbursement, to processing and servicing and pay-off or default.  RFP No. 910031119R0007, § C.2.1, at 3.  The Optimal Processing Solution RFP provides:

> Optimal Processing Solution shall be a highly adaptable solution set which supports current and future FSA products and processes across the entire lifecycle of student financing, including but not limited to functions for application for financing, to origination and disbursement, to processing and servicing and pay-off or default. . . . Solution shall deliver cost efficiencies through significantly increased automation and a modern technical backbone (e.g. modular code base,

cloud operability, microservices, two-speed development compatibility, and/or innovative middleware), aiming for a set of integrated microservices.

*See id.* The Optimal Processing Solution RFP also contemplates the provision of business process operations and requires offerors to provide pricing for contact center support, including calls and chat sessions. *See id.*, Attach. 18, "Proposal with Implementation."

66. The Next Gen Enhanced Processing RFP calls for a solution that will serve as the student financing servicing environment for FSA's existing customers. Amend. 0003, RFP No. 91003119R0005 § C.3.1, at 8. The RFP provides:

> Solution will provide full "life of the loan" servicing: servicing loans for customer accounts of all statuses, including those that are in default. Solution will rapidly migrate existing loans from current servicers, through loan migration (maintaining dynamic and complete customer historical data) while minimizing customer disruption, per target milestones 2 and 3 (Section C.3.5).
>
> . . .
>
> At FSA's discretion, the solution may also initially and temporarily provide the full suite of current capabilities associated with student financing servicing in the FSA environment, including a digital engagement layer, Business Process Operations activities (contact center (personnel support, back office processing, and technical backbone), and support for imaging, printing, and mailing, as well as back-office processing.

*See id.* The Enhanced Processing Solution also calls for a "common integrated data management platform" to "consolidate the functionalities of the multiple websites, mobile applications, and contact centers that currently exist across the full customer lifecycles (from application to school to servicing to default)." *Id.* § C.3.2, at 27. This student financing servicing platform will be used to execute the full range of "life of the loan" servicing functions, including consolidation origination and default support. *Id.* § C.3.3, at 9. The Enhanced Processing Solution RFP contemplates that the base period for the Solution Operations and Maintenance period will be a base period of one year with nine one-year option periods. *See id.* § C.1.2, at 3. The RFP also

provides for an optional transitional business process operations CLIN with a base ordering period of two years and one two-year optional ordering period. *See id.* With regard to the business process operations, the RFP contemplates that the Enhanced Processing Solution will serve as the sole provider for call center support: "Solution may serve as the sole business process operations (both contact center support and back-office processing) provider for all customer accounts as they are migrated onto the new servicing platform until the multiple vendors to be awarded under the separate Business Process Operations solicitation are fully operational." *Id.* § C.3.3, at 12. The Enhanced Processing RFP requires offerors to provide pricing for transitional contact center support services and transitional back-office processing. RFP No. 91003119R0005, Attach. 20, "Proposal with Implementation."

67. Finally, the Next Gen Business Process Operations RFP provides support services across the entire life cycle of student financing, including the personnel necessary to respond to inbound customer and partner inquiries. RFP No. 91003119R0008 § C.3.1, at 6. The RFP provides:

> Business Process Operations will support efficient and effective operations, across the entire life cycle of student financing (from application for financing to origination and disbursement, to processing and servicing and pay off or default). Business Process Operations will do so under FSA's single brand by providing the personnel necessary to respond to inbound customer (e.g. student applicants, borrowers, etc.) and partner (e. schools) inquiries, execute separately developed outbound outreach campaigns, and perform back office processing activities that cannot be automated. These personnel will provide an enhanced level of service, across the full life cycle of student financing, beyond today's environment and one that is consistent with leading financial services providers and other industry leaders recognized for their customer service. Solutions will also support the seamless transition of customers and partners from existing to new solutions, most especially the Enhanced Processing Solution and/or Optimal Processing Solutions, Digital Platform, and Contact Center.

*Id.* at 6-7. The Agency anticipates making multiple contract awards with a base ordering period of five years and one-five year optional ordering period.

68. All three RFPs include the same attachment "Life of loan servicing intended state: Continuous, frequent, and tailored customer engagement," providing for customer engagement activities at different stages of loan delinquency and default. *See* Attach. I (Attach. 9, RFP No. 91003119R0008; Attach. 12, RFP No. 91003119R0005; Attach. 11, RFP No. 910031119R0007). This attachment indicates that vendors will engage in "[c]ontinuous, frequent, and tailored customer engagement" during the life of loan servicing. At different stages of a loan's life, as defined by the number of days the loan is past due, the nature of customer engagement changes. From 0-90 days past due, vendors will engage in "[f]requent outbound calls with customer assistance tone" and engage in communications detailing repayment options and potential involuntary actions. From 91 to 270 days past due, vendors will engage in "[m]ore frequent outbound calls with cautionary tone" and utilize multi-channel engagement, including phone, email, chat, and text. In addition, vendors will engage in "[c]ontinuous, intensified skip tracing" during this time period, a tool traditionally reserved to PCAs. From 271-plus days past due, during which a loan goes into technical default, vendors will make "[d]aily outbound calls with recovery tone" and focus on successful borrower resolution as well as alternative skip tracing. *See id.* Therefore, the attachment contemplates that vendors will engage in default recovery services during the life of loan servicing, employing at least some of the tools historically utilized by PCAs.

69. With regard to estimates of defaulted loan volumes, the Optimal Processing Solution RFP anticipates defaulted loan volumes of more than seven million at the start of the contract but provides no additional loan volume estimates over the successive years. *See* RFP No. 910031119R0007, Attach. 18, Pricing Template, "Volume Assumptions."

**L.  Bid Protests Alleging De Facto Cancellation of the PCA Solicitation and Challenging the Terms of the Next Gen RFPs and Amendments to Next Gen RFPs**

70.  On February 27, 2019, FMS filed a bid protest in the Court of Federal Claims challenging the de facto cancellation of the PCA solicitation and the terms of the Next Gen RFPs.  On March 4, 2019, ConServe also filed a bid protest containing similar allegations.

71.  A mere two days later, and one day before the Court scheduled an initial status conference in the protests, ED announced on the Federal Business Opportunities website that it was cancelling the PCA solicitation.  The Agency offered no rationale or explanation for the cancellation decision.

72.  On March 6, 2019, the Agency also issued a set of Q&As in connection with the Enhanced Processing Solution RFP.  RFP No. 91003119R0005, Attach. 25, Responses to Questions.  Among its responses were the following:

- FSA confirmed that it intends to make one award for the Enhanced Processing Solution.  *See* Q&A #2.

- Vendors are required to provide a proposal for "all operating elements, including those marked as optional" and cannot provide a proposal for only some or all of the optional services.  *See* Q&A No. 3.

- The Enhanced Processing Solution vendor will handle default recovery activities on behalf of FSA.  *See* Q&A No. 33 ("Within its capacity as a transitional BPO provider, the EPS vendor shall handle activities for all borrowers on the EPS system, including those in default. . . . The EPS vendor shall perform all recovery activities on behalf of FSA, not in the capacity of a third party collections agency.").

- ED is no longer distinguishing between FSA, servicers, and PCAs in the Next Gen operating environment.  Rather, FSA through its vendors will attempt to bring defaulted borrowers back into good standing.  *See* Q&A No. 48.

- In response to a question about the federal Fair Debt Collection Practices Act and other state laws, FSA responded "we are continuing to analyze the impact of applicable laws and legal developments on the unique NextGen structure.  If we conclude that communications must be branded differently once loans are in

default, we will instruct the vendor to comply with the applicable legal requirements." *See* Q&A No. 62.

73.     The first due date for receipt of proposals among the Next Gen RFPs is March 27, 2019 for all volumes in connection with the Enhanced Processing Solution RFP. *See* Amend. 0003, RFP No. 91003119R0005 § L-2.2.5, at 62.

74.     The Court held an initial status conference on March 7, 2019 in the FMS and ConServe protests. During the status conference, the Court ordered the Agency to produce an AR addressing the cancellation of the PCA solicitation and the parties' allegations pertaining to the Next Gen RFPs.

**CLAIMS FOR RELIEF**

**COUNT I**

**ED's Cancellation of the PCA Solicitation Was
Unreasonable, Arbitrary and Capricious, and Contrary to Law**

75.     GC Services hereby incorporates by reference the allegations in the foregoing paragraphs, as if fully set forth herein.

76.     In its decision enjoining ED's previous cancellation of the PCA solicitation, the Court of Federal Claims identified a number of flaws in ED's rationale for cancellation, including the Agency's failure to adequately support its new vision for an enhanced servicer program, the lack of thorough estimates of current and future defaulted loan volumes and processing capacity, the failure to identify sources for capacity estimates for the eleven small business contractors, and the absence of projected loan volumes. *FMS Investment Corp., et al. v. United States*, 139 Fed. Cl. 221 (2018). The Agency has apparently failed to address these identified issues, indicating ED did not have a rational basis to cancel the PCA solicitation.

77.     ED's cancellation decision is arbitrary, capricious, and irrational because there has been no significant change in either ED's requirement for default collection services and no explanation from ED for its change in policy.  The Next Gen RFPs appear to contemplate the inclusion of similar work included under the PCA solicitation in the life cycle of student loan servicing to be handled by Next Gen vendors.  *See* Attach. I.  For instance, servicers are required to engage in more frequent outbound calls and intensive engagement with borrowers with loans that are more than 90 days past due and utilize skip tracing efforts for borrowers with loans that are 271 days past due.  *See id.*  However, there are no assurances that this approach and the consolidation of loan servicing and debt collection recovery services within the Next Gen procurement will be effective in preventing defaults.  Tellingly, there are no projections in the Next Gen RFPs regarding the numbers of borrowers ED anticipates will stay out of default as a result of the customer engagement efforts contemplated in the new Next Gen RFPs.  A mere plan to prevent borrowers from defaulting is not a change in requirements.

78.     The cancellation is arbitrary and capricious because it appears to be based on speculation about the effectiveness of the Next Gen procurement to prevent borrowers from entering default.  The Agency's decision to cancel the PCA solicitation is unsupported by any empirical data.  There is no statistical data, evidence, studies, or analysis demonstrating that outreach to delinquent borrowers as part of the Next Gen procurement prevents them from defaulting or will create any benefits to the Government or borrowers.  Absent this evidence, the assumption that Next Gen vendors will ultimately reduce the need for default collection services or create benefits does not provide a reasonable basis for ED's cancellation of the PCA solicitation.

79.     The cancellation is arbitrary, capricious, and irrational because it runs counter to the evidence of alarming annual increases in student loan defaults.  In the last quarter of 2018 alone, 247,400 borrowers entered default, and the total amount of new student loan debt entering default under the Direct Loan Program in the last quarter of 2018 was $5.76 billion.  *See* Attach. C.  By ignoring this critical aspect of the problem, the Agency has failed to conduct a meaningful analysis of its needs, rendering ED's cancellation decision arbitrary and capricious.

80.     Moreover, the one-servicer approach contemplated by the Enhanced Processing Solution violates federal law.  Congress prohibited funding for the Next Gen RFP in the Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019—unless ED provided for the participation of multiple student loan servicers in the procurement.  *See* Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019 (Pub. L. No. 115-245) (Sep. 28, 2018) ("[T]he Secretary shall not award funding for any contract solicitation for a new Federal student loan servicing environment, including the solicitation for the FSA Next Generation Processing and Servicing Environment as amended by the Department of Education on February 20, 2018, ***unless such an environment provides for the participation of multiple student loan servicers*** . . . .") (emphasis added). Accordingly, ED's approach to servicing in the Next Gen procurement does not comply with Congress's requirements.

81.     The cancellation is arbitrary and capricious because ED has ignored a relevant aspect of the problem and failed to conduct a meaningful analysis of its needs before cancelling the procurement.  There has been no significant change in the capacity of the small business PCAs and the contracts of the two large new ATE contractors are about to conclude in April

2019.  Furthermore, the Agency's policy reversal comes as the burgeoning debt crisis becomes increasingly dire, with more borrowers defaulting each year.  *See* Attach. C.  There is no rational connection between the dramatic ***increase*** in the number of defaulted accounts and the Agency's decision to ***reduce*** the number of PCAs under contract for default collection services.

82.     ED's failure to conduct projections of the volume of defaulted accounts is also arbitrary and capricious.  The Next Gen RFPs offer no analysis of the volume of defaulted student loan accounts ED anticipates.  Although the Optimal Processing Solution RFP anticipates defaulted loan volumes of more than seven million at the start of the contract, it provides no additional loan volume estimates over the successive years.  *See* RFP No. 910031119R0007, Attach. 18, Pricing Template, "Volume Assumptions."

83.     The Agency's cancellation decision is further flawed due to a failure to consider relevant data.  There is no precise timeline for implementation of the Next Gen Business Process Operations solution, which includes default recovery services, rendering the Agency's cancellation decision arbitrary and capricious.  The transitional Enhanced Processing Solution vendor, which will handle servicing activities until the Business Process Operations vendors are operational, may perform business process operations for up to ***four years***.  Yet the Next Gen procurement appears to contain no consideration of whether and how many defaulted loans the Next Gen Enhanced Processing Solution vendor will be able to effectively handle.

84.     ED's decision to cancel the PCA solicitation also comes at a significant price to the Government in lost collections.  ED's failure to provide any reasoned analysis of capability evinces a careless attitude to the Agency's statutory obligation to collect on defaulted student loans that is in and of itself capricious.

85.     The Agency's failure to analyze whether its Next Gen RFPs comply with applicable statutes and regulations is also irrational and arbitrary and capricious.  In response to a question about the federal Fair Debt Collection Practices Act and other state laws, the Agency responded that it is "continuing to analyze the impact of applicable laws and legal developments on the unique NextGen structure."  *See* RFP No. 91003119R0005, Q&A No. 62.  The Agency's acknowledgment that the Next Gen RFPs still need to be reviewed for compliance with applicable laws and regulations renders its decision to cancel the PCA solicitation arbitrary and capricious.

86.     The FAR requires contracting officers to "[e]nsure that contractors receive impartial, fair, and equitable treatment."  FAR 1.602-2(b); *see also* FAR 1.102(b)(3) (requiring contracting officers to "[c]onduct business with integrity, fairness, and openness"); FAR 1.102-2(c)(3) (requiring that "[a]ll contractors and prospective contractors shall be treated fairly and impartially").  FAR 3.101 also requires that "[g]overnment business shall be conducted in a manner above reproach and, except as authorized by statute or regulation, with complete impartiality and with preferential treatment for none."

87.     Once offerors have submitted proposals, the fair treatment owed them under the FAR includes a prohibition against the arbitrary cancellation of solicitations.  Although government agencies have broad discretion in determining their needs, once the rights of offerors are implicated, these decisions must be rational.

88.     ED's decision to cancel the PCA solicitation was arbitrary, capricious, an abuse of discretion, and contrary to law.  Defendant failed in its duty to consider GC Services' proposal fairly and honestly and not in an arbitrary and capricious manner by cancelling the PCA solicitation.  GC Services has expended significant time and resources preparing multiple

proposals in response to the initial and revised PCA solicitation, in addition to substantial

litigation fees in multiple rounds of bid protests, including challenging the Agency's recent

unlawful cancellation decision. The Agency's cancellation decision negates GC Services'

efforts.

89.     CICA requires that in conducting procurements for services, agencies obtain full

and open competition through the use of competitive procedures. *See* 41 U.S.C. § 3301. GC

Services has a long history of performing default collection services for ED and was one of only

five contractors to receive an ATE contract in 2015 based on its excellent performance. As such,

GC Services has the systems and resources, as well as expertise, to perform default collection

services. GC Services has been denied an opportunity to compete by the Agency's improper

cancellation of the PCA solicitation. To the extent ED has now included similar services under

its Next Gen procurement, this cannot provide a rational basis to cancel the PCA solicitation.

GC Services cannot provide default recovery services directly to the Government without

teaming with other contractors that can offer the full array of systems architecture and servicing

required by ED. Had GC Services been afforded a meaningful opportunity to compete for

default collection services under the PCA solicitation, it would have had a substantial chance for

award. Accordingly, Defendant's cancellation of the PCA solicitation precludes GC Services

from competing for default collection services, violates CICA, and is contrary to law.

90.     GC Services has also been substantially prejudiced by the cancellation of the PCA

solicitation because GC Services has expended significant time and resources preparing multiple

proposals in response to the PCA solicitation, in addition to substantial litigation fees in

connection with that solicitation. GC Services first prepared a proposal in response to the

issuance of the PCA solicitation in 2015 and has been engaged in litigation in connection with

awards pursuant to the PCA solicitation since 2016. The Agency's cancellation decision negates GC Services' substantial efforts to work with the Agency to manage its significant student loan collection needs.

91.    Accordingly, the Agency violated 5 U.S.C. § 706(2)(A) because its actions lack a rational basis and are contrary to statute and regulation.

### COUNT II

**ED's Decision to Consolidate Separate, Multiple Requirements in the Next Gen RFPs is Unreasonable, Arbitrary and Capricious, and Contrary to Law**

92.    GC Services hereby incorporates by reference the allegations in the foregoing paragraphs, as if fully set forth herein.

93.    CICA requires that solicitations permit full and open competition and contain restrictive provisions and conditions only to the extent necessary to satisfy the needs of the agency. 41 U.S.C. § 3301(a)(1); FAR Subpart 6.1. Under CICA, the term "full and open competition" means that "all responsible sources are permitted to submit sealed bids or competitive proposals on the procurement." 41 U.S.C. § 107.

94.    The new Next Gen RFPs seek to consolidate an IT Solution with other loan services. The New Business Process Operations RFP, for example, states that ED will "procure an enterprise-wide, FSA-branded omni-channel digital platform featuring a mobile-first, mobile-complete, and mobile-continuous solution." RFP No. 91003119R0008 § C.2.2, at 5. The "digital platform will consolidate the functionalities of the multiple websites, mobile applications, and contact centers that current exist across the full customer lifecycles (from application to school servicing to default)." *Id.* at 5-6. The Enhanced Processing Solution RFP also states that the Enhanced Processing Solution "will provide full 'life of the loan' servicing:

servicing loans for customer accounts of all statuses, including those that are in default."
Amend. 0003, RFP No. 91003119R0005 § C.3.1, at 7.

95.    Combining default servicing requirements in the New Optimal Processing Solution, Enhanced Processing Solution, and Business Process Operations RFPs is not reasonably required to satisfy ED's needs.

96.    Receiving some competition under the Enhanced Processing and Business Process Operations RFPs does not relieve ED of the burden under CICA of justifying restrictions to full and open competition.

97.    ED has not provided any reasonable justification for combining the requirements under the Next Gen RFPs, including the consolidation of loan services and default collection services, as necessary to meet its needs. Allowing a separate solicitation for default collection services would actually provide ED with more choice as to meet its requirements as it would not be bound to use the same servicer. The presence of additional companies like GC Services would also result in a wider range of prices for default collection services.

98.    ED's reason for consolidating these requirements in the Next Gen procurement reflects the belief that it is administratively more convenient to manage a small number of entities performing all of the requirements as opposed to having a large number of entities providing loan servicing and PCAs providing default collection services. Administrative convenience, however, is not a legal basis to justify the consolidation of requirements where, as here, the consolidation of requirements restricts competition.

99.    Furthermore, CICA and its implementing regulations require that the scales be tipped in favor of ensuring full and open competition, whenever concerns of economy or efficiency are being weighed against ensuring full and open competition.

100. Since 2009, GC Services has been performing default collection services under its ED contract and has regularly competed for such work in the past and had a reasonable expectation that ED would re-compete this work or reopen the PCA solicitation after this Court enjoined the cancellation of that solicitation in September 2018. GC Services would therefore compete for these default collection services, and there is a substantial chance that it would be awarded a contract for such services if ED revised the Next Gen RFPs or called for revised proposals under the improperly cancelled PCA solicitation.

101. By consolidating default servicing requirements in the Next Gen RFPs, ED has unduly restricted competition and excluded highly-rated PCAs like GC Services from competing for default services under the Next Gen requirement.

102. The consolidation of default collection services in the Next Gen procurement is unreasonable, arbitrary, capricious, and is in violation of CICA and the FAR, and therefore also contrary to law.

103. Accordingly, the Agency violated 5 U.S.C. § 706(2)(A) because its actions lack a rational basis and are contrary to statute and regulation.

## COUNT III

**ED's One Servicer-Approach in the Next Gen Enhanced Processing Solution RFP Is Contrary to Law**

104. GC Services hereby incorporates by reference the allegations in the foregoing paragraphs, as if fully set forth herein.

105. The Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019 (Pub. L. No. 115-245) (Sep. 28, 2018) made funding for the Next Gen procurement contingent on ED's utilization

of multiple student loan servicers managing borrower accounts, among other conditions. As such, the statute places restrictions on how ED may run its procurement.

106.    ED anticipates making one award under the Next Gen Enhanced Processing Solution RFP, which may perform business process operations, including loan servicing and default recovery services, for up to four years.

107.    ED's one-servicer approach violates Congress's explicit instruction in the Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019 to utilize more than one servicer to handle borrower accounts and the full life-cycle of student loans.

108.    Accordingly, the Agency violated 5 U.S.C. § 706(2)(A) because its actions lack a rational basis and are contrary to statute.

## INJUNCTIVE RELIEF FACTORS

109.    GC Services is entitled to injunctive relief. In deciding whether to issue injunctive relief, the Court considers whether: (1) the plaintiff is likely to succeed on the merits of the case; (2) the plaintiff will suffer irreparable harm if the Court withholds injunctive relief; (3) the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) it is in the public interest to grant injunctive relief.

110.    As explained above, ED's decision to cancel the PCA solicitation was arbitrary, capricious, and otherwise not in accordance with law. The cancellation lacks a rational basis because there is no change in ED's requirements, the decision is counter to the evidence, and the Agency failed to consider a relevant aspect of the problem and conduct a meaningful assessment of its needs. In addition, to the extent ED's decision is based on the implementation of the Next

Gen procurement, it also lacks a rational basis because there is no evidence that the customer outreach called for in the Next Gen RFPs will reduce the volume of student loan defaults.

111.    Furthermore, by combining default recovery requirements in the Next Gen procurement with requirements for constructing an IT system architecture and loan servicing, ED has unduly restricted competition and excluded GC Services and other top-performing PCAs from competing for these requirements.  Accordingly, the consolidation of these requirements is arbitrary, capricious, and contrary to law.

112.    Furthermore, ED's decision to adopt a one-servicer approach in the Next Gen Enhanced Processing Solution violates the Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019 and is therefore contrary to law.

113.    The irreparable harm to GC Services is clear.  GC Services' loss of the opportunity to compete for the work under the PCA solicitation and Next Gen RFPs, and loss of the profits it would have earned had it been successful in either competition, constitutes sufficient irreparable injury to support an injunction.  In addition, the failure of an offeror to have its proposal fairly and lawfully considered itself constitutes irreparable injury.  ED breached its contractual duty to fairly and honestly consider GC Services' proposal because it cancelled the PCA solicitation without a rational basis for so doing.

114.    By failing to evaluate proposals submitted in connection with the PCA solicitation and depriving it from directly competing under Next Gen, ED is undermining GC Services' competitive position.  Although GC Services is continuing to work accounts in repayment that remain with GC Services, the in-repayment period of GC Services' ATE contract expires in

April 2019.  Following this date, GC Services will be in a worse position to compete for default collection services.

115.    The irreparable harm to GC Services is not outweighed by any harm to the United States.  Any delays in the transition to the Next Gen procurement are outweighed by the paramount importance of ensuring that ED complies with applicable statutes and regulations in conducting the Next Gen procurement.  Moreover, if ED encounters problems associated with its Next Gen procurement, those problems are of its own making, which also tips the balance of hardships in GC Services' favor.

116.    Injunctive relief is also in the public interest.  The public has an interest in honest, open, and fair competition, and whenever a party is improperly excluded from that process, that interest is compromised.  Furthermore, the public is better served if offerors are given the fair treatment required by FAR 1.602-2(b) than if agencies may cancel solicitations without a rational basis.  Finally, it is well established that there is an overriding public interest in preserving the integrity of the federal procurement process by requiring government officials to follow procurement statutes and regulations.

## **REQUEST FOR RELIEF**

Wherefore, Plaintiff GC Services requests that this Court:

1)      Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 *et seq.*, and Rule 57 of the Rules of the Court of Federal Claims, holding that ED's cancellation of the PCA solicitation (RFP No. ED-FSA-16-R-0009) was arbitrary, capricious, an abuse of discretion, and contrary to law and that ED's decision to procure default collection services under the Next Gen RFPs is arbitrary, capricious, and in violation of CICA and other applicable procurement laws and regulations;

2)      Issue an injunction (i) ordering ED to rescind the cancellation of the PCA solicitation, restoring the posture of the process before the illegal cancellations, and directing the Department of Education to proceed with the award process under the PCA solicitation; and (ii) requiring ED to cancel the Next Gen procurement or unbundle default collection services and separately procure default collection services in a manner that allows GC Services an opportunity to provide these services directly to ED; or, alternatively (iii) requiring ED to extend GC Services' ATE contract or issue another ATE contract to GC Services;

3)      Award GC Services its costs of pursuing this action, including reasonable attorney's fees and expenses and interest;

4)      Alternatively, award GC Services its bid preparation and proposal costs pursuant to 28 U.S.C. § 1491(b)(2); and,

5)      Grant GC Services such other relief as the Court deems just and proper.

Dated: March 11, 2019                     Respectfully submitted,

                                          s/William M. Jack
                                          William M. Jack
                                          KELLEY DRYE & WARREN LLP
                                          Washington Harbour, Suite 400
                                          3050 K Street, NW
                                          Washington, DC  20007-5108
                                          (202) 342-8521
                                          (202) 342-8451 (Fax)
                                          wjack@kelleydrye.com

                                          *Attorney for Plaintiff GC Services Limited Partnership*

Of Counsel:

William C. MacLeod
Amba M. Datta
KELLEY DRYE & WARREN LLP
Washington Harbour, Suite 400
3050 K Street, NW
Washington, DC  20007-5108
(202) 342-8400

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2019, a true and correct copy of the foregoing was electronically filed with the Clerk of the U.S. Court of Federal Claims using the CM/ECF system.

s/William M. Jack
William M. Jack